T.C. Memo. 1997-248


UNITED STATES TAX COURT


BIG HONG NG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

STRONG HOPE, LTD., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 20814-93, 21277-93.          Filed June 2, 1997.


<u>Albert C. Lum</u>, for petitioners.

<u>Debra K. Estrem</u> and <u>James P. Thurston</u>, for respondent.


MEMORANDUM OPINION

JACOBS, <u>Judge</u>:  In docket No. 20814-93, petitioner Big Hong Ng (Ms. Ng) seeks a redetermination of the following revised tax determinations made by respondent:

| | | | Additions to Tax | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1) | Sec. 6653(a)(1)(B) | Sec. 6654 | Sec. 6661 | Sec. 6662 |
| 1986 | $1,327,802 | $331,951 | $66,390 | --- | [1] | --- | $331,951 | --- |
| 1987 | 830,395 | 207,850 | 41,570 | --- | [1] | --- | 207,850 | --- |
| 1988 | 878,617 | 219,654 | --- | $43,930 | --- | --- | 219,654 | --- |
| 1989 | 1,431,742 | 357,936 | --- | --- | --- | --- | --- | $286,348 |
| 1990 | 256,186 | 64,047 | --- | --- | --- | $16,869 | --- | --- |

[1] 50 percent of the interest on the portion of the underpayment attributable to negligence.

A substantial portion of the deficiencies and additions to tax was asserted in respondent's amended answer.

In docket No. 21277-93, petitioner Strong Hope, Ltd. (Strong Hope), a Hong Kong corporation wholly owned by Ms. Ng, seeks a redetermination of the following deficiency and additions to tax:

| | | Additions to Tax | |
|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662 |
| 1989 | $262,298 | $52,460 | $52,460 |

The aforementioned docketed cases have been consolidated for trial, briefing, and opinion.

Following concessions by the parties, the issues remaining for decision are: (1) Whether Ms. Ng had unreported income in the amounts determined by respondent; (2) whether Ms. Ng is entitled to claimed pass-through losses from her S corporation, Hong Kong Restaurant, Inc.; (3) whether Ms. Ng is entitled to defer the gain from the sale of certain real estate pursuant to section 1031; (4) whether Ms. Ng received a liquidating distribution from Strong Hope when that corporation transferred its interest in real estate to her; (5) whether Ms. Ng is entitled to the entire investment interest deduction claimed; (6) whether Ms. Ng is entitled to a claimed net operating loss carryover; (7) whether Ms. Ng is liable for an accuracy-related penalty and for additions to tax for

negligence, substantial understatement, failure to file timely returns, and failure to pay estimated tax; (8) whether Strong Hope had discharge of indebtedness income; (9) whether Strong Hope's basis in certain real estate that it transferred should be adjusted as determined by respondent; (10) whether respondent properly disallowed a net operating loss carryover to Strong Hope; and (11) whether Strong Hope is liable for an accuracy-related penalty and for an addition to tax for failure to file a timely return.

All section references are to the Internal Revenue Code for the years under consideration. All Rule references are to the Tax Court Rules of Practice and Procedure.

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated herein by this reference.

### Background

Ms. Ng, also known as Don Hong Ng, Bik Hung Ng Leong, and other names, resided in San Francisco, California, at the time she filed her petition. Ms. Ng's tax returns for all years under consideration were untimely filed.

Ms. Ng was born in 1935 and came to the United States from Hong Kong in approximately 1958. She studied English and music in the United States, and became a resident alien shortly after her marriage in 1962 to Sik Chong Leong in Reno, Nevada. They were divorced in 1968 and had no children. Ms. Ng acquired her U.S. citizenship in 1966. Ms. Ng has a son, Timothy Lee, who was born

in 1957.

Strong Hope was incorporated in Hong Kong in 1981. It owned a 50-percent undivided interest in a rental property at 850 Stockton Street in San Francisco during part of 1989. Ms. Ng owned the other half interest. In its petition, Strong Hope states its principal place of business to be c/o Poon and Company, CPAs, 43-59 Queens Road East, Hong Kong. Strong Hope's 1989 tax return was untimely filed.

Ms. Ng owned or controlled the following bank accounts during the years under consideration:

| Account Title | Bank |
| --- | --- |

United States:

| | |
| --- | --- |
| Strong Hope | Union Bank |
| Strong Hope Limited (Calif.) | Bank of America |
| Permanent Union Limited | Bank of the Orient |
| Strong Hope Limited | Sumitomo Bank |
| Ms. Ng | Bank of America |

Hong Kong:

| | |
| --- | --- |
| Ms. Ng | Hang Seng Bank |
| J.B. Wings | Wing Lung Bank |
| Strong Hope | Wing Lung Bank |
| Permanent Union Ltd. (HK) | Wing Lung Bank |
| Don Hong Ng | Wing Lung Bank |
| Don Hong Ng | Wing Lung Bank |
| Ms. Ng and Sik Yuen Ng | Wing Lung Bank |

Ms. Ng owned interests in the following entities during the years under consideration:

San Francisco:

| | |
| --- | --- |
| Golden Dragon Restaurant | 50% ownership |
| Permanent Union Ltd. | 100% |
| Strong Hope Limited (Calif.) | 100% |

```
Ocean City Restaurant          5%
```

Seattle:

```
Hong Kong Inv. Ltd.            100%
Hong Kong Restaurant, Inc.     100%
Ocean City Restaurant          8%
Ocean City Investments         unknown
```

Hong Kong:

```
Permanent Union Limited        100%
Ocean City Restaurant
   and Night Club Limited      at least 4.5%
Strong Hope                    100%
Bik Hung Investment Limited    100%
J.B. Wings                     50%
```

Ms. Ng directly or indirectly owned interests in the following properties during the years under consideration:

| Property | Owner |
|---|---|

San Francisco:

| 1610 Lombard | Ms. Ng |
| 1733 Larkin | Ms. Ng |
| 850 Stockton | Ms. Ng and Strong Hope |
| 857 Clay | Strong Hope Limited (Calif.) |
| 1835 Franklin | Ms. Ng |

Seattle:

| 507 Maynard | Hong Kong Investments |
| 609 South Weller | Ocean City Investments |

Hong Kong:

| Flat 1, 41A Stubbs Road | Ms. Ng |
| Flat 2, 41A Stubbs Road | Ms. Ng |

Ms. Ng contends that she has difficulty understanding English, which is not her native language, and that accounts for discrepancies in statements she made during respondent's investigation. Although Ms. Ng's trial testimony was given largely

through an interpreter, we found that when using English to testify, she did not have any difficulty.

For convenience and clarity, we have combined additional findings of fact and opinion with respect to each issue.

Issue 1.  Unreported Income

The largest adjustments to Ms. Ng's income are based on respondent's determination that Ms. Ng failed to report substantial amounts of income.  Specifically, respondent determined that Ms. Ng failed to report: (a) Self-employment income which was deposited into bank accounts she controlled in the amounts of $54,849 in 1986, $50,444 in 1987, $563,513 in 1988, and $346,993 in 1989; (b) income consisting of deposits from Hong Kong into bank accounts she controlled, rental and interest income, and forgiveness of debt income, not subject to self-employment tax in the amounts of $168,300 in 1986, $247,761 in 1987, $170,545 in 1988, $212,459 in 1989, and $93,208 in 1990; and (c) income which was deposited into the tip account, discussed infra, as well as other Hong Kong bank accounts, in the amounts of $1,643,928 in 1986, $242,098 in 1987, $245,355 in 1988, $719,163 in 1989, and $159,153 in 1990.

In the amended answer, respondent asserted additional unreported income, totaling $3,271,690 for the 5 years under consideration, from unexplained deposits to bank accounts in foreign banks.  Of this amount, at least $2,577,089 arises from deposits to the tip account, discussed in detail, infra. Respondent bears the burden of proof with respect to the increase

in the asserted deficiencies and additions to tax made in the amended answer. Ms. Ng bears the burden of proof with respect to the deficiencies and additions to tax determined by respondent in the notice of deficiency. Rule 142(a).

Ms. Ng claims that respondent's deficiency determination was arbitrarily derived, and as a result, the presumption of correctness generally attributed to the notice of deficiency should disappear. In this regard, the United States Court of Appeals for the Ninth Circuit (where an appeal in Ms. Ng's case would lie) has held that in order for the presumption of correctness to attach to the notice of deficiency in unreported income cases, the Commissioner must come forward with substantive evidence establishing "some evidentiary foundation" linking the taxpayer to the income-producing activity, Weimerskrirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), revg. 67 T.C. 672 (1977), or "demonstrating that the taxpayer received unreported income." Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1982), affg. an Order of this Court; see also Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985), affg. an Order of this Court. We therefore must examine the record to determine whether there is a minimal evidentiary foundation supporting respondent's determination of unreported income.

In the instant case, we find the record contains substantive evidence to support respondent's determination of unreported income. See Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir.

1993), affg. T.C. Memo. 1991-636; <u>Erickson v. Commissioner</u>, 937 F.2d 1548, 1551 (10th Cir. 1991), affg. T.C. Memo. 1989-552. We do not find that respondent's determinations were arbitrary and thus do not agree with Ms. Ng's assertion that the burden of proof should shift to respondent.

Ms. Ng transacted business using large amounts of cash. She commingled her personal funds with funds of entities she owned or controlled in her U.S. and Hong Kong bank accounts, and she commingled the funds of one entity with those of another. Moreover, she disregarded the legal ownership of the accounts when writing checks. For example, she deposited into Strong Hope's checking account rents from property located at 857 Clay Street, which was owned by Strong Hope Limited (Calif.) and wrote checks from Strong Hope's checking account to pay expenses of property located at 1610 Lombard Street which she wholly owned. Ms. Ng claims she "commingled funds and used cash and cashier's checks on many occasions out of fear that the respondent or other creditors would seize her accounts."

Revenue Agent Theresa Martin (the revenue agent) reconstructed Ms. Ng's income for the years under consideration by analyzing Ms. Ng's bank deposits and cash expenditures. Use of the bank deposits and cash expenditures method to reconstruct income is well established. <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); <u>Parks v. Commissioner</u>, 94 T.C. 654, 658 (1990); <u>Nicholas v. Commissioner</u>, 70 T.C. 1057, 1064 (1978); <u>Estate</u>

of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). In a cash expenditures analysis, the amount by which a taxpayer's cash expenditures exceeds his known sources of income is assumed to be taxable income, unless the taxpayer can show the expenditures were made from a nontaxable source. DeVenney v. Commissioner, 85 T.C. 927, 930 (1985).

In analyzing the bank deposits, the revenue agent separated cash, checks, cashier's checks, and wire transfers. She examined the source of each deposit. She separated those items subject to self-employment tax, such as presumed receipts from the restaurants, from those items not subject to self-employment tax, such as rental income. These appeared as separate adjustments in the notice of deficiency with respect to Ms. Ng.

To the extent possible the revenue agent eliminated those items that had been reported or came from nontaxable sources, such as transfers and refinancing proceeds. The revenue agent also subtracted from unidentified cash deposits the maximum amount of reported rents that could have been paid in cash or by check; moreover, she subtracted substantiated partnership draws paid directly to Ms. Ng by Golden Dragon Restaurant. We are satisfied that the revenue agent gave Ms. Ng credit for every nontaxable source of income that could be identified. Moreover, before the trial, respondent conceded certain nontaxable items that became

apparent from records and documents summonsed from Hong Kong after the notice of deficiency was issued and certain other items ultimately substantiated by Ms. Ng.

During a July 22, 1991, interview, Ms. Ng told the revenue agent that she had only one foreign bank account from 1986 through 1989, and that only her salary from Ocean City Restaurant and Night Club, Limited in Hong Kong (Ocean City HK) was deposited into that account. In response to a discovery request, Ms. Ng's counsel informed respondent that Ms. Ng had signature authority over 2 foreign accounts, one account at Hang Seng Bank and one account at Wing Lung Bank, which belonged to Ocean City HK. Ms. Ng refused to consent to the release of her foreign bank records until ordered to do so by the U.S. District Court for the Northern District of California. The revenue agent ultimately discovered, and obtained records showing, that Ms. Ng had one account at Hang Seng Bank and six accounts at Wing Lung Bank. The additional income asserted in the amended answer involves deposits to Ms. Ng's bank accounts at Hang Seng Bank and Wing Lung Bank.

The revenue agent also analyzed Ms. Ng's cash expenditures. Those expenditures that could not be traced to a nontaxable source or reported income were considered unreported income. For example, the revenue agent included $45,568.68 as unreported income for 1988, which was the amount Ms. Ng paid in cash for a cashier's check on July 5, 1988, because the revenue agent could not trace that cash purchase to a nontaxable source.

Tip Account

One of the Hong Kong accounts the revenue agent examined was referred to by the parties as the tip account.  The reason for such nomenclature is because the deposits into this account came from tips paid to employees of Ocean City HK.  Ms. Ng denies ownership of this account.

Ocean City HK has seating capacity for approximately 5,000 people and is the largest restaurant in Hong Kong.  Ms. Ng owned at least a 4.5-percent interest in Ocean City HK and was employed there as deputy managing director from 1978 until 1991. Her duties included supervision of personnel, floor shows, and food preparation.  She signed checks on the restaurant's behalf but was not involved in accounting.

Ms. Ng and her brother, Sik Yuen Ng, who also was employed at Ocean City HK, opened the tip account at Wing Lung Bank on March 11, 1981.  The account was in their names, and they each had signature authority.

Deposits to the tip account from 1986 through 1990 were generally in cash as follows:

| Year | Amount Deposited | Number of Deposits |
|------|------------------|--------------------|
| 1986 | $1,543,418 | 156 (6 noncash deposits) |
| 1987 | 231,541 | 57 (3 noncash deposits) |
| 1988 | 228,910 | 49 (all cash) |
| 1989 | 567,919 | 36 (3 noncash deposits) |
| 1990 | 5,301 | 1 (cash) |

All the withdrawals from the tip account which the revenue agent could trace were for the benefit of Ms. Ng or a restaurant

which she partially owned in the United States.  The withdrawals occurring from 1986 through 1989 fall into three general categories:

* $491,752--transferred directly to Ms. Ng's personal bank account in the United States or to American Express to pay her personal American Express bills;

* $535,012--paid for the direct benefit of U.S. restaurants in which Ms. Ng had an ownership interest; and

* $1,920,158--no information provided.

In February 1991, Ms. Ng resigned from her position at Ocean City HK and transferred a portion of her stock ownership to her son.  This was apparently done as a result of a controversy concerning her use of the tip account.  The managing director of the restaurant, Jack Lee, also resigned and transferred ownership of all of his stock to Ms. Ng's son in February 1991.  Ms. Ng and Mr. Lee had been business partners since 1965.

Sometime in 1990 or early 1991, Ocean City HK was reorganized and new owners were brought into the business.  In May 1991, a newly constituted board of directors decided to close the tip account.

The accounting firm of KPMG Peat Marwick (Peat Marwick) was employed to conduct a financial audit of Ocean City HK for the year ending March 31, 1991. James Arkoosh, Peat Marwick's Hong Kong resident partner, testified that the tip account was included as an asset of Ocean City HK on its balance sheet for the year ended March 31, 1991.  He did not know whether the tip account had been

treated as an asset of Ocean City HK for any of the years under consideration, and no persuasive evidence was introduced for us to conclude that the tip account belonged to the restaurant.

In her posttrial brief, Ms. Ng claims that she did not own the tip account but rather it was owned by Ocean City HK, that certain deposits into the account were counted twice by respondent, and that disbursements to her from the account were loans. The record in this case belies these claims.

Ms. Ng and her brother had complete control over the tip account. Although the source of deposits into the account may have been tips received by Ocean City HK employees, a substantial portion of the withdrawals from the account went to Ms. Ng or for her benefit. We therefore find that Ms. Ng controlled the tip account and treated it as her own.

The parties stipulated that $98,911 of the deposits in the tip account were not included in respondent's adjustments because that amount was transferred to Ms. Ng's Bank of America account and already had been counted in determining her reconstructed income. Ms. Ng has not shown that other amounts were counted twice. Further, we are not convinced that the withdrawals from the tip account were loaned to her, or that she intended to repay any such alleged loans.

Nonetheless, we believe some disbursements from the tip account were for the benefit of Ocean City HK shareholders other than Ms. Ng, who in effect acted as agent for Ocean City HK in the

United States. The parties stipulated that $530,603 in disbursements from the tip account between 1986 and 1989 were paid to Ocean City Restaurant in San Francisco, in which Ms. Ng had a 5-percent ownership interest, or to its suppliers. Accordingly we find, and thus hold, that only 5 percent of the $530,603 deposited into the tip account was income to Ms. Ng.

The parties also agreed that $473,660 was paid directly to Ms. Ng from the tip account. Ms. Ng claims that some of the $473,660 went to Ocean City Seattle and Ocean City San Francisco, as well as to the Golden Palace Restaurant in Los Angeles, in which she had no ownership interest. Other than an exhibit showing that a $50,000 withdrawal from the tip account on November 30, 1987, was recorded on the books of Ocean City HK as a loan to the Golden Palace, Ms. Ng presented no evidence that any specific disbursement went to any of these restaurants. The funds were wired directly to Ms. Ng, and there is no evidence that she transmitted the money to the Golden Palace. Accordingly, we find, and thus hold, that all of the $473,660 paid directly to Ms. Ng from the tip account is income to her.

The parties agreed that $4,409 was paid from the tip account to Golden Dragon Restaurant or its suppliers. Ms. Ng is a 50-percent owner of the Golden Dragon, and we find, and thus hold, that half of this $4,409 is income to her.

The parties stipulated that $18,092 was disbursed from the tip account to pay Ms. Ng's personal credit card bills. We find, and

thus hold, that the entire amount of those deposits is income to Ms. Ng.

To summarize, except for the amounts that we found are not income to Ms. Ng, we find, and thus hold, that all of the tip account deposits are income to Ms. Ng.

Other Accounts

The revenue agent used unexplained cash deposits to other bank accounts Ms. Ng owned or controlled as the basis to reconstruct Ms. Ng's income.

Ms. Ng's personal checking account in the United States was at the Bank of America in San Francisco. The deposits to the Bank of America account, after reduction for reported and nontaxable rents and partnership draws, determined to be unreported income, included:

| Year | Cash Deposits | Number of Deposits | Rent, Draw Reduction | Unreported Income Adjustment |
|------|---------------|--------------------|----------------------|------------------------------|
| 1986 | $ 68,866 | 58 | ($14,017) | $ 54,849 |
| 1987 | 80,798 | 30 | ( 30,354) | 50,444 |
| 1988 | 121,760 | 56 | ( 34,925) | [1]101,911 |
| 1989 | 61,210 | 37 | -0- | 61,210 |

[1] No explanation was given for the mathematical discrepancy.

Ms. Ng controlled an account at Union Bank in San Francisco that she opened in the name of Strong Hope, as well as an account at Bank of the Orient in San Francisco in the name of Permanent Union Ltd. Both companies were wholly owned by Ms. Ng. The revenue agent analyzed the deposits to these accounts and determined that the following unexplained cash deposits made to

each account (after reduction for the maximum reported rents that could have been received in cash) represented unreported income of Ms. Ng:

### 1988 Cash Deposits

| | |
|---|---|
| Union Bank (39 deposits) | $59,157 |
| Bank of the Orient (53 deposits) | 67,545 |
| Rent reduction | (48,541) |
| Adjustment | $78,161 |

Ms. Ng also made deposits of checks from her restaurants and other identified and unidentified sources. She made wire transfers of unidentified funds to Sumitomo Bank. She used cash from unidentified sources to purchase cashier's checks. She made contributions to capital and loans to her restaurants with unidentified funds. Ms. Ng made numerous check and cash deposits into her accounts at Hang Seng Bank and Wing Lung Bank in Hong Kong, and numerous wire deposits from the Hong Kong banks to her Bank of America account in San Francisco.

Cash and check deposits into Ms. Ng's account at Hang Seng Bank were as follows:

| Year | Total Deposits |
|---|---|
| 1986 | $170,910 |
| 1987 | 228,512 |
| 1988 | 42,835 |
| 1989 | 60,686 |
| 1990 | 21,350 |

The revenue agent reduced these deposits by $30,000 to account for two transfers ($15,000 in 1986 and $15,000 in 1987), and the revenue agent determined the remaining amounts to be unreported income.

Deposits into one of Ms. Ng's accounts at Wing Lung Bank were as follows:

| Year | Total Deposits |
|------|----------------|
| 1986 | $260,442 |
| 1987 | 1,558 |
| 1988 | 11,141 |
| 1989 | 167,515 |
| 1990 | 34,754 |

Wire transfers from Wing Lung Bank and Hang Seng Bank into Ms. Ng's Bank of America account in San Francisco were as follows:

| Year | Total Deposits |
|------|----------------|
| 1986 | $163,300 |
| 1987 | 291,980 |
| 1988 | 168,549 |
| 1989 | 296,895 |

The revenue agent reduced the above amounts by $225,000 to account for several nontaxable transactions that could be traced.

Ms. Ng contends that partnership draws in cash from the Golden Dragon Restaurant were improperly added to Ms. Ng's income by the revenue agent. In her bank deposits analysis, the revenue agent subtracted substantiated partnership draws paid directly to Ms. Ng from Golden Dragon Restaurant for 1987. The revenue agent requested documents that would substantiate draws from the restaurant for other years, but Ms. Ng did not provide them. Under the circumstances, we find that it was appropriate for the revenue agent to subtract from her calculation of Ms. Ng's unreported income only those partnership draws that were substantiated.

Ms. Ng also contends that the revenue agent improperly treated as income to Ms. Ng amounts that were deposited into accounts

belonging to separate entities Ms. Ng owned. However, Ms. Ng treated accounts belonging to entities she owned as though they were her personal accounts. As stated previously, she disregarded the legal ownership of the accounts and commingled personal funds with funds of the entities she controlled. She also disregarded legal ownership of the accounts when writing checks. We find that it was reasonable for respondent to treat the accounts as belonging to Ms. Ng, as she herself had done.

Upon review of all of respondent's adjustments and supporting documentation, we conclude that with the exception of certain amounts deposited into the tip account that we found should be excluded from Ms. Ng's reconstructed income, and $32,559 of cancellation of indebtedness income for 1989,[1] Ms. Ng had

---

[1] Respondent determined that amounts deposited into Strong Hope's account at Union Bank were the income of Ms. Ng. On the books of Strong Hope the deposits were treated as loans to Ms. Ng. To avoid being whipsawed, respondent increased the amount Ms. Ng owed to Strong Hope to reflect that the amounts deposited into Strong Hope's account at Union Bank and used for her benefit were amounts Strong Hope loaned to Ms. Ng. Respondent also adjusted the loan balance shown on the books of Strong Hope as due from Ms. Ng to include expense items that had been booked as loans from Ms. Ng to Strong Hope but which were never substantiated by Ms. Ng. The net amount left owing to Strong Hope by Ms. Ng was $32,559, and respondent took the position that this debt was forgiven and/or canceled on May 9, 1989, when Strong Hope distributed its one-half interest in 850 Stockton Street to Ms. Ng.

In her posttrial brief, respondent states that if we hold that "the amounts deposited into Strong Hope's Union Bank account are the income of Ms. Ng", then respondent concedes that the forgiveness of income issue should be resolved in favor of Ms. Ng.

We find that the amounts deposited into Strong Hope's Union

(continued...)

unreported income in the amounts determined by respondent.

_____

A final note with respect to the unreported income issue. In her posttrial brief, Ms. Ng asserts that "the nature of this case cries out for a net worth analysis" and requests the Court to "direct the parties to cooperate in an effort to do a net worth analysis to reach a more accurate and just result." We will not accede to Ms. Ng's request. Whatever Ms. Ng's net worth, it is not relevant to whether the bank deposits and other income traced to her during the years under consideration constitute income to her. What happened to this income after Ms. Ng received it does not change its character as income. Moreover, there is "no requirement that the Commissioner use the net worth method for computing income." Estate of Mason v. Commissioner, 64 T.C. at 662.

Issue 2.  Hong Kong Restaurant Losses

We now turn our attention to whether Ms. Ng is entitled to claimed pass-through losses from her solely owned S corporation, Hong Kong Restaurant, Inc. This, in turn, depends upon whether Ms. Ng had sufficient basis in that corporation to claim the losses.

Pursuant to section 1366, S corporation income, losses, deductions, and credits are passed through pro rata to shareholders. The amount that can be claimed is limited to the sum of a shareholder's adjusted basis in the corporate stock, and his

_____

[1](...continued)
Bank account are the income of Ms. Ng.

adjusted basis in any indebtedness that the corporation owes to the shareholder.   Sec. 1366(d).

Ms. Ng deducted losses from Hong Kong Restaurant, Inc., on her individual tax returns as follows:

| Year | Deduction |
|------|-----------|
| 1986 | $173,228 |
| 1987 | 149,993 |
| 1988 | 284,778 |
| 1989 | 129,328 |

Ms. Ng established that she purchased 3,675 shares of stock in Hong Kong Restaurant, Inc., a State of Washington corporation, for $36,750 when that company was incorporated in 1983.  Sixteen other investors also purchased stock at that time, and the company's initial capitalization was $500,000.  Ms. Ng contends that she later purchased all of the stock owned by the other investors and invested at least $700,000 in the company.  There is no credible evidence to support her claim.  Minutes of an August 3, 1984, board of directors' meeting show Ms. Ng as the sole shareholder, but there is no evidence as to how she acquired the additional shares or how much she might have paid for them.

Ms. Ng claims that a lack of evidence as to how the stock was acquired "is not important for purposes of determining her initial basis * * * for Federal income tax purposes."  Ms. Ng also contends that preparation of tax returns by a reputable accounting firm "supports an inference that the capital stock and loans from shareholders reflected on the balance sheets would have been reviewed and are correct."   We disagree.   See Sperl v.

Commissioner, T.C. Memo. 1993-515.

Ms. Ng has the burden of proving her basis in an investment. With the exception of the initial $36,750 stock purchase, she has presented no evidence that would permit us to make such a determination. Furthermore, prior to 1986, she claimed at least $94,218 in accumulated losses which would result in a decrease in her basis in the stock of (or loans to) Hong Kong Restaurant, Inc. See secs. 1.1367-1(c)(2) and 1.1367-2(b)(1), Income Tax Regs.

The record reveals that Hong Kong Restaurant, Inc., purchased its restaurant assets from Fong & Fong Co., Inc., in November of 1983 for $700,000. Ms. Ng claims that she borrowed $500,000 to permit the company to purchase the assets. The record, however, does not support this claim. Rather, the record reveals that Ms. Ng borrowed $500,000 from Wing Lung Bank on February 4, 1985, which was 15 months after the purchase of the assets, and according to bank records that $500,000 loan was to be used for the remodeling of Ocean City Restaurant in San Francisco.

Ms. Ng's wholly owned corporation, Hong Kong Investments Limited, obtained another $500,000 loan from Wing Lung Bank on September 18, 1984. However, we do not believe those funds were loaned to Ms. Ng to invest in Hong Kong Restaurant, Inc., as she contends. Rather, we believe the proceeds of the additional $500,000 loan were used to purchase the building that Hong Kong Restaurant had been leasing from another party.

Ms. Ng claims she further borrowed $100,000 from Hong Kong

Investments, Limited to pay for Hong Kong Restaurant, Inc. The evidence does not support this claim.

To summarize, Ms. Ng proved an initial basis of $36,750 in the stock of Hong Kong Restaurant, Inc. which was totally absorbed by pass-through losses she claimed prior to 1986. She did not prove any additional contributions to capital or shareholder loans. Accordingly, we hold that the deductions claimed during the years under consideration were properly disallowed.

Issue 3.  Section 1031 Exchange

Ms. Ng deferred gain from the sale of her Larkin and Lombard Street properties in San Francisco pursuant to section 1031. The deferred gain from the sale of her Larkin Street property in 1988 was $393,177, and the deferred gain from the sale of her Lombard Street property in 1989 was $516,633. Ms. Ng's sale of her Larkin and Lombard Street properties was followed by Strong Hope's conveyance of its one-half interest in an apartment building at 850 Stockton Street in San Francisco to Ms. Ng. Ms. Ng owned the other half interest in the Stockton Street property. Respondent determined that Ms. Ng was not entitled to the deferred gain on the sale of these 2 properties on the ground that Ms. Ng did not intend to exchange the properties for like-kind property, as required to obtain deferral of gain under section 1031. The underlying facts support respondent's assertions.

In July of 1988, Wing Lung Bank demanded that Ms. Ng satisfy her delinquent bank loans. Ms. Ng advised the bank that she would

raise the cash needed to pay off her loans by selling the Larkin Street and Lombard Street properties in an exchange transaction.

Ms. Ng entered into a contract to sell the Larkin Street property to David Mandel for $565,000 on September 2, 1988. She subsequently transferred the property to Independent Exchange Services, Inc. (IES), which in turn transferred the property to Mr. Mandel on November 10, 1988. The net cash due Ms. Ng was $85,317.57 after all existing loans and taxes were paid.

Ms. Ng entered into a contract to sell the Lombard Street property to JSM & Inter Realty Corporation for $990,000 on January 5, 1989. She subsequently transferred the property to IES, which in turn transferred the property to JSM & Inter Realty Corporation on February 6, 1989. The net proceeds from this sale to Ms. Ng ($304,178.26) were placed in an escrow account with Founders Title Company (Founders).

On January 11, 1989, Ms. Ng agreed to pay $1.1 million to Strong Hope for the purchase of Strong Hope's 50-percent interest in the Stockton Street property. Also on January 11, Ms. Ng and Strong Hope agreed to an addendum to the sale contract providing that IES would be substituted for Ms. Ng as buyer, and that once Strong Hope conveyed the property to IES, the property then would be transferred from IES to Ms. Ng.

Ms. Ng was required to pay $100,000 to the Internal Revenue Service (IRS) on May 9, 1989, apparently to satisfy a tax lien, in order to open her restaurant in San Francisco. She also had to

receive the exchange property by that time as required under section 1031(a)(3)(B). IES, Strong Hope, and Ms. Ng entered into an agreement on that date providing that IES would purchase the Stockton Street property from Strong Hope for $1.1 million, and that Strong Hope would deed the property directly to Ms. Ng. The purchase price was to be paid as follows:

```
$  400,088.33  Assumption of deed of trust
   389,343.80  Cash in escrow
   310,000.00  Promissory note from Ms. Ng to IES, assigned to
               seller
       567.87  Paid by Ms. Ng
$1,100,000.00
```

Ms. Ng, as agent of Strong Hope, deeded Strong Hope's 50-percent interest to herself on May 9, 1989. Ms. Ng wanted the escrowed funds to be released on that date. Founders refused to pay the escrowed funds directly to Strong Hope because Founders previously had been instructed to release the money only to IES. On May 11, 1989, the escrow was canceled pursuant to instructions from IES, and on May 16, 1989, Founders issued a check to IES for $309,056.94, representing the proceeds from the sale of Ms. Ng's Lombard Street property.

The proceeds from the sale of the Larkin Street and Lombard Street properties, ostensibly used to acquire the Stockton Street property from Strong Hope in a section 1031 exchange, actually were used by Ms. Ng for her own purposes as follows:

* January 12, 1989--IES issued a $85,165.54 check to Strong Hope, representing net proceeds from the sale of the Larkin Street

property.

* January 13, 1989--IES check deposited into Strong Hope's Union Bank account, purportedly as a deposit toward the purchase price of the Stockton Street property. Ms. Ng purchased a money order for $85,165.54 with funds from Strong Hope's Union Bank account. She used the money order to make a mortgage payment on the Stockton Street property, one-half of which she owned outright. One-half of the payment ($42,583.27)--benefiting the other 50-percent interest in the Stockton Street property Strong Hope owned --was recorded as a loan to Strong Hope from Ms. Ng.

* May 16, 1989--Founders issued check to IES for $309,056.94.

* May 23, 1989--IES issued check to Strong Hope for $157,161.59, representing net proceeds after tax withholding from sale of the Lombard Street property. Of the $303,828.26 disbursed, IES withheld $110,000 for the IRS and $36,666.67 for the California Franchise Tax Board.

* May 25, 1989--IES check for $157,161.59 deposited into Strong Hope's Union Bank account, where the balance was $1,469 immediately prior to the deposit. Ms. Ng purchased 3 cashier's checks on May 25 with the deposited funds: $100,000 payable to Strong Hope Limited, a California corporation (Strong Hope Limited), which is not the same entity as petitioner Strong Hope, Ltd., a Hong Kong corporation and purported seller of the Stockton Street property; $25,000 payable to Strong Hope Limited; and

$25,000 payable to Ms. Ng. The 3 cashier's checks were treated as follows:

$100,000--booked by Strong Hope Limited as a loan from Ms. Ng.

$25,000--deposited into Strong Hope Limited's account at Bank of America on May 25, 1989.

$25,000--deposited into Ms. Ng's personal account at Bank of America on May 25, 1989.

\* <u>June 23, 1989</u>--Check for $22,000 drawn on Strong Hope Limited's account at Bank of America and deposited into Ms. Ng's personal account at Bank of America.

Section 1001(c) requires recognition of gain or loss on the sale or exchange of property. However, under section 1031(a), nonrecognition is permitted if property held for productive use in a trade or business or for investment is exchanged solely for like-kind property also held for business or investment purposes.

Section 1031(a) assumes that the new property is substantially a continuation of the old investment. See <u>Commissioner v. P.G. Lake, Inc.</u>, 356 U.S. 260, 268 (1958). A taxpayer must satisfy the specific requirements and underlying purpose of section 1031(a) to qualify for deferral of gain. <u>Bolker v. Commissioner</u>, 760 F.2d 1039, 1044 (9th Cir. 1985), affg. 81 T.C. 782 (1983). A transaction will not be treated as an exchange if the taxpayer had control over the sale proceeds. <u>Coupe v. Commissioner</u>, 52 T.C. 394, 409 (1969); see also <u>Klein v. Commissioner</u>, T.C. Memo. 1993-

491. A transaction also will not qualify under section 1031 if the person with whom the taxpayer made the exchange was acting as the taxpayer's agent. Coupe, 52 T.C. at 406.

Ms. Ng's transactions did not meet the specific requirements or the underlying purpose of section 1031. She appropriated the proceeds from the sale of the Larkin Street and Lombard Street properties for her own use immediately after the money was deposited into Strong Hope's bank account, which Ms. Ng treated as her own. We do not believe she ever intended to pay the $310,000 promissory note she gave as part of the purchase price. Strong Hope acted as Ms. Ng's agent when it deeded the Stockton Street property directly to Ms. Ng, contrary to the original agreement of the parties. Furthermore, Ms. Ng never intended to exchange her Larkin Street and Lombard Street properties for property of like kind. She sold those properties because she needed the proceeds to satisfy her delinquent loans with Wing Lung Bank.

We conclude that Ms. Ng did not satisfy the requirements or underlying purpose of section 1031 and accordingly hold that she is liable for gain on the sale of the Larkin Street and Lombard Street properties.

Issue 4. Strong Hope Liquidation

The next issue we consider relates to the tax consequences of Strong Hope's transfer of its interest in the Stockton Street property to Ms. Ng. Respondent determined that Strong Hope made a liquidating distribution to Ms. Ng when it transferred the Stockton

Street property to her.  Ms. Ng contends that because Strong Hope sold its interest in the Stockton Street property to her, after the sale, it had an asset, namely, the $110,000 that IES paid to the IRS on Strong Hope's behalf and which Strong Hope claims should be refunded to it.

We previously determined that Ms. Ng did not acquire an interest in the Stockton Street property from Strong Hope in a section 1031 exchange transaction.  In our opinion, the correct characterization of the transfer of Strong Hope's interest in the Stockton Street property to Ms. Ng is a distribution of property, not a sale.

A liquidating distribution of property by a corporation to a shareholder is taxable to the shareholder as gain from the sale or exchange of property to the extent the distribution exceeds the shareholder's basis in his stock.  Any distribution that is part of a series of distributions under a plan to redeem all outstanding stock is treated as a liquidating distribution.  Sec. 346(a). Liquidating distributions are treated as full payment for a shareholder's stock.  Sec. 331(a).  To find a corporate liquidation, there must be a manifest intention to liquidate and a continuing purpose to terminate corporate affairs, and the corporation's activities must be directed to such termination. Estate of Maguire v. Commissioner, 50 T.C. 130, 142 (1968).

The parties stipulated that Strong Hope's sole U.S. business activity was the rental of its individual one-half interest in the

Stockton Street property. There is nothing in the record to suggest that Strong Hope had business activities outside the U.S.

Upon the purported sale of its one-half interest in the Stockton Street property to Ms. Ng, Strong Hope filed a final tax return for 1989 and reported no tax liability for that year. Emerald Lee, the accountant who prepared Strong Hope's return, testified that she was informed that Strong Hope was going to be liquidated. Additionally, Ms. Ng stated in a 1990 Form 5471, "Information Return of U.S. Persons With Respect To Certain Foreign Corporations," that:

> Strong Hope has distributed all of its assets in early 1990. The company has remained dormant for the remainder of calendar year 1990[,] * * * no longer conducts business of any kind and has no assets.

The fair market value of Strong Hope's interest in the Stockton Street property was $1.1 million. Ms. Ng assumed a $400,088 mortgage and had a $2 basis in her Strong Hope stock. The liquidation of Strong Hope results in a gain of $699,910. Accordingly, we hold that Ms. Ng realized a gain of $699,910 from the liquidation of Strong Hope.

Issue 5. Investment Interest Deduction

Respondent determined that Ms. Ng had $120 of interest income in 1989, and that her investment interest deduction was limited (pursuant to section 163(d)) to $2,000, plus the amount of net investment income, or a total of $2,120. Respondent thus disallowed $59,992 of claimed interest expense. Ms. Ng did not

contest this issue either at trial or in her posttrial brief. Accordingly, we sustain respondent's determination in this regard.

Issue 6.  Net Operating Loss Deduction

Ms. Ng claimed a $13,182 net operating loss deduction in 1986 attributable to a loss carried over from 1985.  Respondent disallowed this deduction.  Ms. Ng has presented no evidence to substantiate the loss.  Because Ms. Ng did not meet her burden of proof, the deduction was properly disallowed.

Issue 7.  Ms. Ng's Additions to Tax

Respondent determined that Ms. Ng is liable for an accuracy-related penalty and for additions to tax for negligence, substantial understatement, failure to file timely returns, and failure to pay estimated tax.

For 1986 and 1987, section 6653(a)(1)(A) imposes an addition to tax of 5 percent of the amount of any underpayment due to negligence or disregard of rules or regulations, and section 6653(a)(1)(B) provides for an addition of 50 percent of the interest payable under section 6601 on the portion of the underpayment attributable to negligence.  For 1988, a 5-percent addition to tax for negligence or disregard of rules or regulations applies pursuant to section 6653(a)(1).  For 1989, section 6662(a) and (b)(1) and (2) imposes a penalty equal to 20 percent of the portion of the underpayment that is attributable to negligence or disregard of rules or regulations, or to substantial understatement of tax.

Negligence is defined as the failure to exercise the due care that a reasonable, prudent person would exercise under similar circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985). A taxpayer has the burden of proving that respondent's determination is in error. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

We are satisfied, and thus find, that the entire underpayment is due to Ms. Ng's negligence and intentional disregard of the Federal income tax rules and regulations. Ms. Ng failed to maintain adequate records. She commingled her personal funds with funds of entities she controlled. She misrepresented material facts to the revenue agent on more than one occasion. She concealed large amounts of taxable income on which she did not pay tax. She concealed ownership of property. We therefore hold that Ms. Ng is liable for the additions to tax for negligence on the entire underpayment for each of the years 1986 through 1988, and for the accuracy-related penalty on the entire underpayment for 1989, excluding the amount by which any of the underpayments is to be reduced in accordance with our findings herein.

Section 6651(a)(1) provides for a 5-percent addition to tax for each month a return is not filed, unless due to reasonable cause, with a maximum addition to tax of 25 percent. Because Ms. Ng did not timely file her returns, section 6651(a)(1) applies to each of the years under consideration.

Section 6654 provides for an addition to tax for failure to pay estimated income tax. Because Ms. Ng failed to pay estimated tax for 1990, section 6654 applies.

Finally, respondent determined an addition to tax under section 6661 for 1986, 1987, and 1988. Section 6661 provides for a 25-percent addition to tax for substantial understatement. We sustain respondent's determination.

Issue 8. Discharge of Indebtedness

Respondent determined that Strong Hope had $516,903 in discharge of indebtedness income in 1989. This discharge of indebtedness income relates to debts Strong Hope owed to Strong Hope Limited (the California corporation) and to Permanent Union Limited, both of which were wholly owned by Ms. Ng. As of 1989, Strong Hope owed $434,012 to Strong Hope Limited, and $82,891 to Permanent Union Limited. Respondent contends that these debts were discharged when Ms. Ng caused Strong Hope to distribute to her its sole asset (i.e., the Stockton Street property) and thus liquidate. Strong Hope argues that it was insolvent prior to the distribution, that it did not liquidate in 1989, and that any discharge of indebtedness was not U.S. source or business income.

Gross income includes income from discharge of indebtedness. Sec. 61(a)(12). However, section 108(a) provides an exclusion if the discharge of indebtedness occurs when the taxpayer is insolvent. Strong Hope contends that it comes within the insolvency exclusion of section 108. We do not agree.

Strong Hope had assets of $1,173,122 and liabilities of $916,991 prior to its distribution of the Stockton Street property. The Stockton Street property was valued at $1.1 million, and according to Strong Hope's books it had other assets totaling $73,122. The company had a mortgage of $400,088 and owed $516,903 to Strong Hope Limited and Permanent Union Limited. Based on these facts, Strong Hope was not insolvent immediately prior to the discharge of indebtedness.

Strong Hope also contends that it did not liquidate in 1989, and thus could not have discharge of indebtedness income. We disagree. Following Strong Hope's distribution of its 50-percent interest in the Stockton Street property to Ms. Ng on May 9, 1989, it effectively ceased doing business and the amounts it owed to Strong Hope Limited and Permanent Union Limited were effectively discharged. Whether a company actually liquidates is not the test for determining whether there is income from discharge of indebtedness. A debt is discharged when it becomes apparent that the debt will never have to be repaid. Brountas v. Commissioner, 74 T.C. 1062, 1074 (1980), vacated and remanded 692 F.2d 152 (1st Cir. 1982).

Finally, Strong Hope contends that any discharge of indebtedness would not be U.S. source income under section 881(a) or income effectively connected with the conduct of a trade or business within the United States under section 882(a). Again, we do not accept this assertion.

The record clearly reveals that Strong Hope's only business activity was the rental of the Stockton Street property in San Francisco, and that the indebtedness to Strong Hope Limited and Permanent Union Limited was related to that activity. We accordingly find that Strong Hope's indebtedness was connected with its business in the United States.

To conclude, we hold that Strong Hope realized discharge of indebtedness income of $516,903 in 1989.

Issue 9.  Stockton Property Basis

For purposes of calculating the amount of gain realized by Strong Hope under section 336(a) on the distribution of the Stockton Street property to Ms. Ng, respondent reduced Strong Hope's adjusted basis in the Stockton Street property. In this regard, respondent contends that Strong Hope understated the accumulated depreciation by $45,820 when it reported the sale of its interest in the property, and second, that a roofing expense of $10,729 which Strong Hope added to basis was not substantiated. Strong Hope does not contest respondent's depreciation adjustment. However, with respect to the roofing expense, Strong Hope asserts that respondent knows that this expense was incurred. The evidence is not sufficient to substantiate the claimed roofing expense. Accordingly, we sustain respondent's adjustments to Strong Hope's basis in the Stockton Street property.

Issue 10.  Other Adjustments

Respondent contends that Strong Hope could not substantiate $41,194 of a claimed net operating loss carryover from 1988. Strong Hope did not contest this determination.  We therefore sustain respondent's determination to the extent the adjustment may affect Strong Hope's 1989 tax year.

Respondent also claims that Strong Hope should be taxed on rental income of $2,977 that it received from Celadon Restaurant in 1988.  We do not have jurisdiction over Strong Hope's 1988 tax year.  Accordingly, we do not sustain this adjustment.

Issue 11.  Strong Hope's Additions to Tax

Respondent determined an addition to tax under section 6651(a)(1) and a penalty under section 6662 against Strong Hope for 1989.

Section 6651(a)(1) imposes an addition to tax for failure to timely file a return. Strong Hope did not timely file its 1989 corporate tax return; thus, it is liable for the addition to tax under section 6651(a)(1).

Pursuant to section 6662, a penalty is imposed on that portion of the underpayment that is attributable to negligence or disregard of rules and regulations or to substantial understatement.  Like Ms. Ng, Strong Hope was uncooperative during the audit, did not provide adequate records, and misrepresented facts to respondent's

agent. We find that Strong Hope was negligent and disregarded rules and regulations, and substantially understated its tax; thus, it is liable for the penalty under section 6662.

To reflect the foregoing and concessions,

<u>Decisions will be entered under Rule 155</u>.